**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wacourts

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAY 2 6 2016

CHIEF JUSTICE

This opinion was filed for record
at 8:00 on May 26, 2016

Supreme Court, Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| TONY LEE, an individual taxpayer; ANGELA BARTELS, an individual taxpayer; DAVID FROCKT, an individual taxpayer and Washington State senator; REUVEN CARLYLE, an individual taxpayer and Washington State representative; EDEN MACK, an individual taxpayer; GERALD REILLY, an individual taxpayer; PAUL BELL, an individual taxpayer; and THE LEAGUE OF WOMEN VOTERS OF WASHINGTON, | ) ) ) ) ) ) ) ) ) ) ) ) | No. 92708-1 |
| Respondents, | ) ) | |
| v. | ) ) | En Banc |
| THE STATE OF WASHINGTON, | ) ) ) | |
| Appellant, | ) ) | |
| and | ) ) | |
| TIM EYMAN; LEO J. FAGAN; and M.J. FAGAN, | ) ) ) ) | |
| Appellants. | ) ) | Filed     MAY 2 6 2016 |

MADSEN, C.J.—Appellants[1] (hereinafter State or sponsors) seek reversal of a

King County Superior Court order declaring Initiative 1366 (I-1366) unconstitutional. At

---

[1] State of Washington, Tim Eyman, Leo Fagan, and M.J. Fagan.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the heart of this case lies the fact that I-1366, if enacted, would "result[] in *either* a one-time reduction in the sales tax <u>or</u> [the proposal of a constitutional amendment]." Corr. Opening Br. of Appellants at 27 (italics added). Based on the plain language of the initiative, we hold that I-1366 requires the legislature to choose between two operative provisions. This does not constitute valid contingent legislation. Instead, this is the kind of logrolling of unrelated measures article II, section 19 of the Washington State Constitution was adopted to prevent. As the trial judge aptly stated, "It is impossible to determine how many people voted for this initiative because they desired adoption of the constitutional amendment at its heart and how many voted for it because they desired the short-term relief of the immediate reduction in the sales tax." Clerk's Papers (CP) at 434.

We affirm the trial court and hold that I-1366 violates the single-subject rule of article II, section 19, and that it is void in its entirety.

## FACTS

I-1366 is before the court for the second time; previously, it was the subject of this court's decision in *Huff v. Wyman*, 184 Wn.2d 643, 649, 361 P.3d 727 (2015). In *Huff*, the plaintiffs sought injunctive and declaratory relief in order to keep I-1366 off the ballot. We held that plaintiffs there did not make the clear showing necessary to grant injunctive relief. *Id.* at 654-55. Secretary of State Kim Wyman placed I-1366 on the November 2015 ballot, and it was approved in the statewide election.

The official ballot title stated:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92708-1

> Initiative Measure No. 1366 concerns state taxes and fees.
>
> This measure would decrease the sales tax rate unless the legislature refers to voters a constitutional amendment requiring two-thirds legislative approval or voter approval to raise taxes, and legislative approval for fee increases.

CP at 36. The explanatory statement summarizes:

> This measure would cut the state retail sales tax from 6.5% to 5.5% on April 15, 2016, unless the legislature first proposes a specific amendment to the state constitution. The proposed amendment must require that for any tax increase, either the voters approve the increase or two-thirds of the members of each house of the legislature approve the increase. It must also require the legislature to set the amount of any fee increases.

*Id.* at 37.

Plaintiffs (now respondents or opponents)[2] filed suit in King County Superior Court, seeking declaratory relief that I-1366 was unconstitutional in its entirety. The superior court judge found for the plaintiffs, declaring I-1366 unconstitutional because it violates the single-subject rule of article II, section 19; the constitutional amendment process outlined in article XXIII, section 1 of the Washington Constitution; and abridges the legislature's plenary power. The State and initiative sponsors sought direct, expedited review in this court, and we granted review. The issues raised by appellants include whether (1) respondents have standing, (2) this case is justiciable, and (3) I-1366 violates article II, section 19, article XXIII, section 1, or article II, section 1 of the Washington State Constitution.

---

[2] Tony Lee, Angela Bartels, David Frockt, Reuven Carlyle, Eden Mack, Gerald Reilly, Paul Bell, and the League of Women Voters of Washington. The plaintiffs in this case are identical to the plaintiffs in *Huff*, except for the League of Women Voters of Washington.

3

ANALYSIS

Standard of Review

Summary judgment orders are reviewed de novo, and this court engages in the same inquiry as the trial court. *Amalg. Transit Union Local 587 v. State*, 142 Wn.2d 183, 206, 11 P.3d 762 (2000). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Construction of a statute is a question of law that we review de novo. *Amalg.*, 142 Wn.2d at 206.

Standing

Opponents claim standing as taxpayers, individuals, and legislators. The State agrees that opponents have standing as taxpayers, but dispute individual and legislator standing. Sponsors contend that opponents do not have standing in any capacity.

This court has previously recognized taxpayer standing to challenge governmental acts. *See, e.g.*, *State ex rel. Boyles v. Whatcom County Superior Court*, 103 Wn.2d 610, 614, 694 P.2d 27 (1985) ("This court recognizes litigant standing to challenge governmental acts on the basis of status as a taxpayer."); *Greater Harbor 2000 v. City of Seattle*, 132 Wn.2d 267, 281, 937 P.2d 1082 (1997) ("The recognition of taxpayer standing has been given freely in the interest of providing a judicial forum for citizens to contest the legality of official acts of their government."). However, "taxpayer disagreement with a discretionary governmental act is not enough to convey standing." *Huff*, 184 Wn.2d at 649. In order to allege standing, the challenger must be a taxpayer,

4

No. 92708-1

request the attorney general take action, and have the request denied before commencing suit. *Boyles*, 103 Wn.2d at 614.

Here, opponents allege taxpayer status, challenge an adopted official act, and requested the attorney general take action, which was denied. Just as this was enough to convey standing to identical parties in *Huff*,[3] so too does it convey standing now. 184 Wn.2d at 649-50.

Sponsors attempt to distinguish *Huff*, arguing that the issue here is the legislature's purely discretionary decision on how to respond to the initiative. This argument misses the mark; opponents are not challenging the potential discretionary acts the legislature may take in response to I-1366. Instead, they are challenging the constitutionality of an adopted official act.

Next, sponsors argue that granting opponents taxpayer standing will "inject the court in on-going legislative processes." Corr. Opening Br. of Appellants at 15 (formatting omitted). We disagree. Opponents make a facial challenge to the constitutionality of a properly challenged initiative, not its unconstitutionality in application, or how the legislature should or may respond to it. It is worth noting that

---

[3]The only difference between respondents/opponents now and the appellant/opponents in *Huff* is the addition of the League of Women Voters of Washington as a party. However, under *Mukilteo Citizens for Simple Government v. City of Mukilteo*, "'[a]n organization 'has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" 174 Wn.2d 41, 46, 272 P.3d 227 (2012) (internal quotation marks omitted) (quoting *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 510, 595, 192 P.3d 306 (2008)). Although an analysis is unnecessary because every member of this suit has taxpayer standing, the League of Women Voters likely also has standing.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

review of an article II, section 19 challenge to the constitutionality of a bill or initiative is routinely granted. *See, e.g., Wash. Ass'n for Substance Abuse & Violence Prevention v. State*, 174 Wn.2d 642, 653-54, 278 P.3d 632 (2012); *City of Burien v. Kiga*, 144 Wn.2d 819, 824, 31 P.3d 659 (2001); *Amalg.*, 142 Wn.2d at 206; *State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 32 Wn.2d 13, 23, 200 P.2d 467 (1948). The opponents have met the requirements of taxpayer standing, and we need not reach the issues of individual and legislator standing.

Justiciability

Justiciability is a threshold requirement that must be satisfied before proceeding to a litigant's claims. *Huff*, 184 Wn.2d at 650. The focus is "whether the question sought to be adjudicated is appropriate for the court to address." *Id.* This court has jurisdiction over constitutional challenges to statutes. CONST. art. IV, § 4; RCW 2.04.010. The State agrees with opponents that the case is justiciable, "especially in light of the issues of substantial public interest" and the "public officials' need for immediate resolution." Appellant State of Wash.'s Corr. Opening Br. at 34. Sponsors, however, maintain it is not.

Under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, and in the absence of issues of "broad, overriding, public import," in order for a court to hear a case, there must be a justiciable controversy

> (1) which is an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial,

rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

*Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973).

The first prong of this test concerns ripeness and mootness. An actual, present, and existing dispute is presented here. The initiative provides for an immediate reduction in the sales tax rate unless the legislature proposes a constitutional amendment. Opponents' claims of unconstitutionality do not require more time or legislative action to become ripe. Either I-1366 contains two subjects or it does not; the passage of time will not make this any clearer. *See, e.g.*, *Coppernoll v. Reed*, 155 Wn.2d 290, 299, 119 P.3d 318 (2005) (holding that preelection subject matter challenges are ripe because postelection events would not further sharpen the issue).

Sponsors argue that the case is not yet ripe "because the legislature has not had the opportunity to address I-1366 free from judicial intervention and no legislator's votes have been impacted." Corr. Opening Br. of Appellants at 10. They cite to *Walker v. Munro*, 124 Wn.2d 402, 879 P.2d 920 (1994), and *League of Education Voters v. State*, 176 Wn.2d 808, 295 P.3d 743 (2013), for support. In *Walker*, the petitioners challenged Initiative 601 and its statutory supermajority requirement for tax increases. We held the petitioners' claim was not justiciable because their main contention was essentially that the legislature would have difficulty raising taxes in the future. *Walker*, 124 Wn.2d at 412. In *League of Education Voters*, the respondents challenged the constitutionality of Initiative 1053, specifically its supermajority and referendum requirements. 176 Wn.2d at 815-16. We held that the legislators had standing and the case was justiciable as to the

7

supermajority requirement because the legislators could point to the ineffectiveness of their vote when a bill they voted for—which carried a majority—did not pass due to the supermajority requirement. *Id.* at 817-18. However, we also held that the challenge to the referendum requirement was not yet ripe because it had never been triggered, and might never be. *Id.* at 820. We have no such speculation here. There is a crucial distinction between an initiative that is unconstitutional on its face—for example, if it purported to amend the constitution or contained multiple, unrelated subjects—and an initiative that is potentially unconstitutional in its application, like the statutory supermajority requirements in *Walker* and *League of Education Voters*.

Sponsors urge this court to require the legislature make its choice as to how to deal with I-1366 before getting involved. The problem with the sponsors' approach is that a bill that contains two subjects, or overrides the procedural safeguards of article XXIII, section 1, or exceeds the scope of the people's initiative power under article II, section 1 will not one day become more or less constitutional. No action by the legislature will resolve the claimed constitutional flaws or alleviate the alleged harm.

The second prong—that the parties have a genuine and opposing interest—is easily met. The third prong is also met—I-1366 results in a significant reduction in our state sales tax and possibly an amendment to our state constitution; these are interests that are direct and substantial, not theoretical. Additionally, the third prong has been construed as encompassing standing, *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 414, 27 P.3d 1149 (2001), and, as discussed above, respondents have taxpayer standing.

8

Finally, the fourth prong is met; a decision by this court will be final and conclusive and will allow the legislature to take the appropriate next steps. No other branch of our government is suited to determine whether I-1366 is constitutional or not.

Issues of "broad overriding public import" are presented as well. *Ripley*, 82 Wn.2d at 814.

> Where the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation.

*State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*, 80 Wn.2d 175, 178, 492 P.2d 1012 (1972). The State agrees with opponents that the issues here are of substantial public interest and require prompt resolution. If constitutional, the initiative will result in either an immediate and yearly $1.4 billion reduction in our State's operating budget or a change to our State's constitution by essentially only a majority of voters. One would be hard pressed to make an argument that this case does not involve issues of substantial public importance, which need immediate resolution.[4] We hold that this case is justiciable both under the UDJA and under the public interest exception.

### The Constitutionality of I-1366

"An exercise of the initiative power is an exercise of the reserved power of the people to legislate." *Amalg.*, 142 Wn.2d at 204. The people, through the initiative

---

[4] Sponsors do not necessarily disagree on the significance of the issues, but rather contest the public interest exception on ripeness grounds. To invoke the public interest exception, the dispute is must be ripe. *Walker*, 124 Wn.2d at 414; *League of Educ. Voters*, 176 Wn.2d at 820. Because we hold the case is ripe, we reject this argument.

process, exercise the same power as the legislature. *Kiga*, 144 Wn.2d at 824. This power is subject to the same constitutional restraints as those placed on the legislature. *Id.* A statute enacted through the initiative process is presumed to be constitutional. *Amalg.*, 142 Wn.2d at 205. We will interpret an initiative as constitutional if possible. *ZDI Gaming, Inc. v. Wash. State Gambling Comm'n*, 173 Wn.2d 608, 619, 268 P.3d 929 (2012); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 149 Wn.2d 660, 671, 72 P.3d 151 (2003). A party challenging the constitutionality of an initiative must demonstrate its unconstitutionality beyond a reasonable doubt. *Amalg.*, 142 Wn.2d at 205.

Opponents claim that I-1366 violates the single-subject rule of article II, section 19, which provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." CONST. art. II, § 19. Article II, section 19 applies equally to initiatives. *Wash. Fed'n of State Emps. v. State*, 127 Wn.2d 544, 551-53, 901 P.2d 1028 (1995).

There are two distinct prohibitions in article II, section 19: (1) no bill shall embrace more than one subject and (2) no bill shall have a subject that is not expressed in the title. *Amalg.*, 142 Wn.2d at 207. Its purpose is "(1) to prevent 'logrolling', or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) to assure that the members of the legislature and the public are generally aware of what is contained in proposed new laws." *Flanders v. Morris*, 88 Wn.2d 183, 187, 558

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

P.2d 769 (1977). Because the parties make no subject-in-title rule arguments, we address only whether I-1366 violates the single-subject rule.

The single-subject rule was written into our constitution because

"there had crept into our system of legislation a practice of engrafting upon measures of great public importance foreign matters for local or selfish purposes, and the members of the Legislature were often constrained to vote for such foreign provisions to avoid jeopardizing the main subject or to secure new strength for it, whereas if these provisions had been offered as independent measures they would not have received such support."

*State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 54 Wn.2d 545, 550-51, 342 P.2d 588 (1959) (quoting *Neuenschwander v. Wash. Suburban Sanitary Comm'n*, 187 Md. 67, 48 A.2d 593, 598-99 (1946)). The key inquiry is whether the subjects are so unrelated that "it is impossible for the court to assess whether either subject would have received majority support if voted on separately." *Kiga*, 144 Wn.2d at 825. If so, the initiative is void in its entirety. *Id.*

Whether an initiative violates the single-subject rule generally starts with the ballot title. *Id.* A general title is broad, comprehensive, and generic; a few well-chosen words, suggesting the general topic, are all that is needed. *Id.*; *see also Amalg.*, 142 Wn.2d at 206-07 (gathering cases). A restrictive title, on the other hand, is specific or narrow. *Kiga*, 144 Wn.2d at 825; *see also Amalg.*, 142 Wn.2d at 210-11 (gathering cases). If a title is general, the initiative may embrace several incidental subjects so long as there is a rational unity between the operative provisions themselves as well as the general topic. *Kiga*, 144 Wn.2d at 825; *Amalg.*, 142 Wn.2d at 201-11. If a title is restrictive, it will not be given "the same liberal construction as general titles; laws with

restrictive titles fail if their substantive provisions do not fall 'fairly within' the restrictive language." *Filo Foods, LLC v. City of SeaTac*, 183 Wn.2d 770, 783, 357 P.3d 1040 (2015) (internal quotation marks omitted) (quoting *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 633, 71 P.3d 644 (2003)). The general versus restrictive approach was designed to allow "the legislature to include in one general enactment all of the statutory law relating to a cognate subject." *State v. Nelson*, 146 Wash. 17, 20, 261 P. 796 (1927).

The State claims I-1366 contains a general title of "taxes," while the sponsors urge the general title is "fiscal restraint." *Amalgamated* and *Kiga* guide our analysis. In *Amalgamated*, the ballot title for Initiative 695 (I-695) stated, "'Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed?'" 142 Wn.2d at 212. We held that I-695 had a general title but that no rational unity existed between the subjects because I-695 had two unrelated purposes, one being to "specifically set license tab fees at $30" and the other being "to provide a continuing method of approving all future tax increases"; and neither subject was necessary to implement the other. *Id.* at 217.

In *Kiga*, the ballot title of Initiative 722 (I-722) stated, "'Shall certain 1999 tax and fee increases be nullified, vehicles exempted from property taxes, and property tax increases (except new construction) limited to 2% annually?'" 144 Wn.2d at 825. We held that the tax nullification provision and the property tax assessment provision related to the general topic of tax relief, but that those subjects were not germane to one another.

12

*Id.* at 827. We reasoned that "[t]he nullification and onetime refund of various 1999 tax increases and monetary charges [was] unnecessary and entirely unrelated to permanent, systemic changes in property tax assessments." *Id.*

I-1366 presents a similar scenario. The subjects of I-1366 are either a reduction to the current sales tax rate and a constitutional amendment, or a reduction to the current sales tax rate and a change to the way all future tax increases are approved. We will assume that I-1366 has a general title of either "taxes" or "fiscal restraint," and that the subjects of a current sales tax reduction and either a constitutional amendment or a change to the way all future taxes and fees are approved relate to "taxes" or "fiscal restraint." Under any iteration, a reduction to the sales tax rate is *unrelated* to both a constitutional amendment, which would impact future legislatures, and to the way that future taxes and fees are approved.

In its essence, I-1366 mirrors I-695 and I-722. Section 2 of I-1366 specifically sets the sales tax rate at 5.5 percent, just as I-695 specifically set license tab fees at $30 and I-722 provided for a one-time nullification and refund of a specific tax. Section 3 of I-1366 proposes a constitutional amendment requiring a supermajority vote or voter approval to raise all taxes and legislative approval to increase any fees. In other words, section 3 requires the creation of a permanent, systemic change in approving all future tax increases, which is similar to the voter approval for tax increases provision of I-695 and the property tax assessment provision of I-722.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We see no substantive difference between the one-time tax reduction coupled with a permanent change to the way all taxes are levied or assessed in *Amalgamated* and *Kiga*, which violated the single-subject rule, and the reduction of the current sales tax rate and a permanent change to the constitution or to the method for approving all future taxes and fees set forth by I-1366. As in *Amalgamated* and *Kiga*, the subjects of a specific reduction in a current sales tax rate, and a constitutional amendment or altering the way the legislature passes all future taxes, may relate to the general title of fiscal restraint or taxes, but they are not germane to each other.

Sponsors, though, argue that *Washington Ass'n for Substance Abuse*, not *Amalgamated* or *Kiga*, controls. There, we held that an earmark of funds for public safety was germane to the general subject of liquor privatization because privatizing liquor implicated public safety and local governments would have to enforce the new liquor sales laws. *Wash. Ass'n for Substance Abuse*, 174 Wn.2d at 656-58. Thus, the earmark was "necessary to implement" the statute. *Amalg.*, 142 Wn.2d at 217. Also relevant was the fact that the legislature had previously treated the subjects of liquor regulation and public welfare together. *Wash. Ass'n for Substance Abuse*, 174 Wn.2d at 657. The same cannot be said of I-1366. Sponsors point to no history that the legislature has treated sales tax reductions and constitutional amendments or supermajority requirements together. And unlike funds to assist law enforcement in policing liquor sales in the newly privatized marketplace, a reduction in the current sales tax rate is not necessary to implement a constitutional amendment or a change to the method for

approving all future taxes and fees; quite the opposite, in fact, since one subject actually voids implementation of the other subject.

The State says that I-1366 does not violate the single-subject rule because it contains only one subject. It says section 3, calling for a constitutional amendment, is merely precatory language and "reflects a non-mandatory expression of the people's policy preference[]" that the legislature propose an amendment requiring a supermajority to raise taxes. Appellant State of Wash.'s Corr. Opening Br. at 28-29. The State heavily relies on *Pierce County v. State*, 150 Wn.2d 422, 431-34, 78 P.3d 640 (2003), where opponents of Initiative 776 (I-776) argued that section 1—titled "Policies and Purposes"—constituted an impermissible second subject. Examples of the language at issue in *Pierce County* included "'[p]oliticians should keep their promises,'" *id.* at 435 (alteration in original), and "'[t]he people *encourage* transit agencies to put another tax revenue measure before voters if they want to continue with a light rail system dramatically changed from that previously represented to and approved by voters.'" *Id.* at 433 n.6. Because the initiative provided no statute or mechanism to bring about such changes, we found them to be "policy fluff," without any operative effect. *Id.* at 434. In holding that I-776 did not violate the single-subject rule, we reasoned that portions of an initiative that do not have any operative effect as separate laws cannot create a second subject problem. *Id.* at 434-36.

I-1366 is quite different. For example, section 3 states that "[the sales tax reduction] takes effect April 15, 2016, unless . . . the legislature, prior to April 15, 2016,

15

refers to the ballot for a vote a constitutional amendment requiring two-thirds legislative approval or voter approval to raise taxes." CP at 25. The State would have us read section 3 as policy language without effect. That is incorrect. Under section 3, the only way to avoid the sales tax reduction is if a specific constitutional amendment is proposed to the people for a vote. The mechanism is in place to see it through—if the people's policy preference is to compel the proposal of an amendment to the people, sections 2 and 3 operate together to bring it about.

On the other hand, section 1 is an example of policy fluff. It states, "The people declare and establish that the state needs to exercise fiscal restraint." *Id.* Given the structure of I-1366 and the operative effect of section 3, we cannot say that section 3 is a "policy expression[] indisputably devoid of any legal effect." *Pierce County*, 150 Wn.2d at 434.

Indeed, the State counters its own argument. In its brief, it argues that I-1366 does not exceed the scope of the people's initiative power because section 3 constitutes a valid legislative act. Appellant State of Wash.'s Corr. Opening Br. at 13. The State cannot have it both ways. Section 3 cannot be a valid legislative act for purposes of article II, section 1 and a mere policy expression for purposes of article II, section 19.

The State also argues that I-1366 does not contain two subjects because it is valid, contingent legislation; section 2 is the only operative part of the initiative and section 3 is simply the set of operative facts that triggers the effectiveness of section 2. "Contingent legislation" is so described because whether the law becomes effective is contingent on

16

circumstances outside the legislation itself. The result desired by the legislature will be achieved either by the circumstances occurring, by rendering the legislation necessary, or by passing the law enacting the result.

The State compares I-1366 to the contingent legislation at issue in *State v. Storey*, 51 Wash. 630, 99 P. 878 (1909), and *Brower v. State*, 137 Wn.2d 44, 969 P.2d 42 (1998). In *Storey*, the statute at issue dealt with a restriction against livestock roaming at large. 51 Wash. at 631. However, the ordinance would not go into effect until 10 freeholders petitioned the county commissioner to survey the land and determine whether three-quarters of it was fenced or not. *Id.* If three-quarters of the land was fenced, the law went into effect and people could no longer let their livestock roam freely. *Id.* In *Brower*, the contingency was that the stadium financing bill would be null and void unless the football team affiliate contracted to reimburse the State and counties for the cost of the special election referendum. 137 Wn.2d at 53-54. The contingency ensured that those who stood to benefit from the special election covered the costs of it. *Id.* at 54. In short, the bills in *Storey* and *Brower* proposed laws whose effective date were to be postponed until the happening of a contingency closely related to the proposed law, which may or may not have happened.

Typically, challenges to contingent legislation arise from claims of unlawful delegation of legislative power. *See, e.g., Storey*, 51 Wash. at 633; *Royer v. Pub. Util. Dist. No. 1 of Benton County*, 186 Wash. 142, 145-46, 56 P.2d 1302 (1936); *State v. Dougall*, 89 Wn.2d 118, 123, 570 P.2d 135 (1977); *Brower*, 137 Wn.2d at 53-54. The

17

contingencies in *Storey* and *Brower* differ significantly from the claimed contingency here. The first difference is that I-1366 depends on inaction, not an operative set of facts outside the legislation itself. The State frames the contingency as the happening of a future event, but this is not so. Rather than making the sales tax reduction contingent on a future event, I-1366 starts with the sales tax reduction that will go into effect on April 15. Section 3, the constitutional amendment provision, is not an event that triggers the reduction, but an escape hatch through which to avoid it. In contrast, the contingencies in *Storey* and *Brower* were designed to avoid the enactment of unnecessary legislation.[5]

Also missing here is a nexus between the contingency and the law it set in motion; in *Storey* and *Brower*, there was a purpose and relationship between the future event and the expediency of the legislation. Here, we find no nexus between a constitutional amendment—even one that deals with future taxes and fees—and a reduction to the current sales tax rate. Although we have not previously discussed the need for a nexus between the operative set of facts and the law it sets in motion, it is a matter of common sense. If the operative portion of a law is contingent on a set of facts unrelated to the legislation, it is unlikely to escape a challenge based on an unlawful delegation of legislative authority. Rather than contingent legislation, we hold that I-1366 contains two operative an unrelated provisions.

---

[5] An example of contingent legislation containing a constitutional amendment is in *Opinion of the Justices*, 287 Ala. 326, 251 So. 2d 744 (1971). There, the Supreme Court of Alabama held that an act increasing the excise tax on gasoline, which would become effective upon adoption of constitutional amendment authorizing issuance of general obligation bonds, was valid contingent legislation because the gasoline tax was pledged to repay the bonds. *Id.* at 329.

Comparing the contingencies in *Storey* and *Brower*, I-1366 is so far afield from valid contingent legislation—in structure, relatedness, and purpose—that we need not reach the question of whether or not it delegates legislative authority. I-1366 contains two operative and unrelated provisions; calling it "contingent legislation" does nothing to cure its constitutional defects.

Historically, article II, section 19 challenges have involved initiatives that enact two or more unrelated operative pieces of law. *See, e.g.*, *Kiga*, 144 Wn.2d at 827; *Amalg.*, 142 Wn.2d at 216-17; *Yelle*, 32 Wn.2d 13. Here, I-1366 contains two unrelated operative provisions but only one will go into effect. The fact that the initiative does not enact both provisions does not save it from violating article II, section 19. It is still impossible to determine how many people voted for one provision and how many for the other. In one sense, an initiative so structured warrants the protections of article II, section 19 even more than bills flawed by traditional logrolling because many voters will not even receive the benefit of at least having the provision they did vote for go into effect.

The State argues that "regardless of whether *some* voters *desired* the contingency to occur, *all* voters affirming [I-1366] *voted for* the measure's sales tax reduction." Appellant State of Wash.'s Corr. Opening Br. at 30. Therefore, it contends, I-1366 cannot constitute logrolling because the people voted for only one provision. But this argument implicitly supports our finding of logrolling; it acknowledges that some people

19

may have voted for the sales tax reduction because they desired the constitutional amendment. That is the definition of "logrolling."

Finally, the second subject of I-1366—whether it be a constitutional amendment or a change to the way all future taxes and fees are approved—alters the process for amending our state constitution, which runs afoul of article XXIII. The processes for amending the Washington State Constitution are outlined in article XXIII, section 1. Article XXIII states that "[a]ny amendment . . . to this Constitution may be proposed in either branch of the legislature; and if the same shall be agreed to by two-thirds of the members elected to each of the two houses," it will be submitted to the voters at the next general election. CONST. art. XXIII, § 1. A constitutional amendment may not be proposed or enacted through initiative. *See generally id.*; *Huff*, 184 Wn.2d at 651 ("an initiative must propose the enactment of a law and not the amendment of the constitution"). The process and importance of amending our constitution was best described by this court in *Ford v. Logan*:

> The process is manifestly distinct from that involved in the enactment of ordinary bills or laws. The legislature can only propose, it cannot effectuate, amendments. Such complete action is not legislative in nature under the general provisions of our constitution. Rather, this act of amending or repealing the basic organic instrument of government is of a higher order than the mere enactment of laws within the framework of that organic structure. This distinction has been prudently and thoughtfully included in the structure of American constitutional government, for to permit direct action by a majority to change a basic form of government would enable any given majority to remove all protections contained within constitutional frameworks.

79 Wn.2d 147, 155, 483 P.2d 1247 (1971). "Under article 23, these safeguards consist of the deliberative nature of a legislative assembly, the public scrutiny and debate made possible during the legislative process, the requirement of a two-thirds vote in each independent house of a bicameral body, and the tempering element of time." *Id.* at 156.

The State argues that section 3 of I-1366 does not violate article XXIII because the legislature would still have to go through the processes outlined in article XXIII. Whether true or not, this argument fails to appreciate the "do this or else" structure of the initiative. If the legislature does not propose the amendment, it will be faced with a $1.4 billion-per-year loss in revenue. This structure, taken to its logical conclusion, establishes a new process for amending the constitution.[6] The new norm would be for initiative sponsors to pair one drastic or undesirable measure with an ultimatum that it go into effect unless a specific constitutional amendment is proposed to the people. This new process amounts to a small percentage of voters effectuating a constitutional amendment by two majority votes[7] and is simply not one contemplated by the constitution, even if further action is required by the legislature. Because the second

---

[6] I-1366 does not require legislators to propose the amendment or vote for it, but the pressure of the "do this or else" structure of the initiative may have the effect of pushing the legislature to pass an amendment to avoid an immediate tax reduction.

[7] Signatures amounting to eight percent of the last gubernatorial election are all that is required to put an initiative on the ballot. CONST. art. II, § 1(a). A mere majority is required for the initiative to pass. CONST. art. II, § 1(d). If the initiative directly proposes or forces the legislature to propose an amendment to the people, then only a majority vote is required to ratify the amendment. CONST. art. XXIII, § 1. Thus, by allowing an initiative to propose an amendment, two majority populous votes could amend the constitution without the legislature becoming involved.

subject establishes a new process for amending the constitution, it also violates article XXIII.

CONCLUSION

We hold that the opponents to I-1366 have taxpayer standing and this case is justiciable. We also hold that I-1366 contains two operative, unrelated provisions and does not constitute valid contingent legislation. Thus, we hold that I-1366 violates the single-subject rule and that it is void in its entirety. Because it is unnecessary to reach opponents' additional arguments, we decline to do so. We affirm the judgment of the trial court.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Madsen, C. J.

WE CONCUR:

Wiggins, J.

Owens, J.

Stephens, J.

Fairhurst, J.

*Lee v. State*, No. 92708-1 (González, J. concurring)

GONZÁLEZ, J.—I agree with the majority that this controversy is justiciable and that at least some of the respondents have standing. *See League of Educ. Voters v. State*, 176 Wn.2d 808, 817, 295 P.3d 743 (2013). I write separately because, in my view, this case is best resolved solely under article XXIII of our state constitution, which provides:

> Any amendment or amendments to this Constitution may be proposed in either branch of the legislature; and if the same shall be agreed to by two-thirds of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the ayes and noes thereon, and be submitted to the qualified electors of the state for their approval, at the next general election; and if the people approve and ratify such amendment or amendments, by a majority of the electors voting thereon, the same shall become part of this Constitution, and proclamation thereof shall be made by the governor.

WASH. CONST. art. XXIII, § 1. Thus, to amend our constitution, there is a three-step process. First, a constitutional amendment must be proposed in either branch of the legislature. *Id.* Second, two thirds of each legislative house must approve the proposal. *Id.* Third, the proposal must be approved by the voters. *Id.*; *see also Ford v. Logan*, 79 Wn.2d 147, 155, 483 P.2d 1247 (1971). The only other lawful

1

*Lee v. State*, No. 92708-1 (González, J. concurring)

method to amend our constitution is through a constitutional convention. WASH. CONST. art. XXVII, §§ 2-3.

The initiative power, by contrast, is strictly legislative. *Ford*, 79 Wn.2d at 154 (citing WASH. CONST. art. II, § 1). It enshrines the power of the people to propose, enact, and reject bills and laws. It cannot be used to propose amendments to the constitution any more than the legislature could propose a constitutional amendment without following the rules laid down in article XXIII. *Ford*, 79 Wn.2d at 155; *Culliton v. Chase*, 174 Wash. 363, 378-79, 25 P.2d 81 (1933).

This was not an oversight. Within a generation of our founding, our State considered allowing constitutional amendments to be proposed by initiative. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 249 (2d ed. 2013) (citing Claudius O. Johnson, *The Adoption of the Initiative and Referendum in Washington*, 35 PAC. NW. Q. 291 (1944)). We did not do so. Our constitution can be amended only by following the rules set down in article XXIII.

The most direct, simple, and clear way to resolve this case is to recognize that Initiative 1366 sets article XXIII on its head. The initiative ignores the constitutionally required first step—the proposal of a constitutional amendment in either house. WASH. CONST. art. XXIII, § 1. The initiative then skips the constitutionally required second step—a supermajority vote in each house approving the amendment—and jumps directly to something like the third—

2

*Lee v. State*, No. 92708-1 (González, J. concurring)

ratification of the voters before any vote in the legislature. Only then does it jump back to the constitutionally mandated second step—a two thirds vote of each house to place a constitutional amendment on the ballot. Clerk's Papers at 25 (Initiative 1366, § 3). Initiatives are not the proper vehicle to amend the constitution. Initiative 1366 is unconstitutional.[1]

With these observations, I join the majority in result.

---

[1] I have an additional concern about this initiative. In effect, it is an attempt, through a statewide vote, to limit the power and responsibility of an individual legislator, elected by his or her own district, to propose and act on proposed legislation and constitutional amendments. *See* UTTER & SPITZER, *supra*, at 63 (citing *Maynard v. Valentine*, 2 Wash. Terr. 3, 10, 3 P. 195 (1880)). Legislators have a constitutionally cognizable interest in maintaining the effectiveness of their votes. *League of Educ. Voters*, 176 Wn.2d at 817 (quoting *Coleman v. Miller*, 307 U.S. 433, 438, 59 S. Ct. 972, 83 L. Ed. 1385 (1939)). I am concerned that this initiative unconstitutionally undermines that interest.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

González, J.

Gordon McCloud, J.

Yu, J.