FILED
COURT OF APPEALS
DIVISION II

2014 NOV -4 AM 10: 02

STATE OF WASHINGTON
BY_____
DEPUTY

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY,<br><br>                    Appellant,<br><br>v.<br><br>WAHKIAKUM COUNTY, a political subdivision of Washington State,<br><br>                    Respondent. | No. 44700-2-II<br><br><br><br><br>PUBLISHED OPINION |

LEE, J. — The Washington State Legislature has charged the Department of Ecology (Ecology) with executing the state's biosolids program to facilitate and encourage recycling, rather than disposal, of sewage waste. In 2011, Wahkiakum County passed an ordinance banning the use of the most common class of biosolids within the County. Ecology filed an action for an injunction and declaratory judgment arguing that the County's ordinance conflicts with state law, and, thus, is unconstitutional under article XI, § 11 of the Washington Constitution which prohibits local government from enacting ordinances that is "in conflict with general laws." The superior court granted the County's cross-motion for summary judgment declaring the ordinance constitutional. Ecology appeals.

We hold that the County's ordinance is unconstitutional because it irreconcilably conflicts with state law. Accordingly, we reverse the superior court's order granting summary judgment in favor of the County and remand for entry of summary judgment in favor of Ecology.

No. 44700-2-II

## FACTS

In 1992, the Washington State Legislature enacted chapter 70.95J RCW establishing the state's biosolids program. The legislature designated Ecology as the body responsible for implementing and managing the biosolids program. RCW 70.95J.020. The purpose of the biosolids program is to recycle sewage waste by retreating it and using it as a "beneficial commodity" in land applications "in agriculture, silviculture, and in landscapes as a soil conditioner." RCW 70.95J.005(1)(d), (2); .010(1) and (4).

There are four classes of biosolids: exceptional quality (EQ), class A, class B, and septage. Because of the time spent in a septic tank before collection, septage is essentially the equivalent of class B biosolids. Class B biosolids are treated with processes that eliminate at least 99 percent of pathogens. Class A biosolids are treated with processes that reduce pathogens to below detectable levels. EQ biosolids are class A biosolids that are additionally treated to reduce other contaminants.[1] Class A biosolids comprise approximately 12 percent of biosolids produced in Washington; class B biosolids comprise approximately 88 percent of biosolids.

Because pathogens have not been completely eliminated from class B biosolids, their use is restricted. WAC 173-308-210(5). Public access to and crop harvesting from land treated with class B biosolids are restricted for at least 30 days while natural environmental processes remove remaining pathogens from the biosolids. WAC 173-308-210(5)(a). Class B biosolids are used in farming, land reclamation, and other applications where public access restrictions are practical. In

---

[1] EQ biosolids are used in the same manner as class A biosolids, and septage is used in the same manner as class B biosolids. For the purpose of clarity, our references to class A refers to both class A and EQ and our references to class B refers to both class B and septage.

2

contrast, class A biosolids are limited to land applications where public access restrictions are impractical—primarily home, lawn, and garden use. Biosolids can also be disposed of using two other methods: incineration and landfill disposal. However, landfill disposal is prohibited except in cases where it is economically infeasible to use or dispose of the material other than in a landfill. RCW 70.95.255; WAC 173-308-300(9).

In 2011, the County passed Ordinance No. 151-11 (the ordinance), which states, in relevant part, "No Class B biosolids, septage, or sewage sludge may be applied to any land within the County of Wahkiakum." Clerk's Papers (CP) at 49. Ecology filed a complaint against the County alleging that the ordinance violated article XI, § 11 of the Washington Constitution, and seeking a declaratory judgment and an injunction against the County's implementation of the ordinance. Ecology filed a motion for summary judgment, and the County filed a cross-motion for summary judgment. The superior court granted the County's cross-motion for summary judgment. Ecology appeals.[2]

## ANALYSIS

The issue before us is whether the County's ordinance banning the land application of all class B biosolids violates article XI, § 11 of the Washington Constitution. We hold that it does.

---

[2] On appeal, several parties have been granted permission to file amicus briefs in this case. Lewis County filed an amicus curiae brief in support of the County. Natural Selection Farms, Inc. and Boulder Park, Inc. (collectively the "farm amici"), and Northwest Biosolids Management Association, National Association of Clean Water Agencies, Washington Association of Sewer and Water Districts, and the town of Cathlamet (collectively the "public amici") have filed amicus briefs in support of Ecology.

No. 44700-2-II

## I. STANDARD OF REVIEW

We review an order granting summary judgment de novo. *Weden v. San Juan County*, 135 Wn.2d 678, 689, 958 P.2d 273 (1998) (citing *Greaves v. Med. Imaging Sys., Inc.*, 124 Wn.2d 389, 392, 879 P.2d 276 (1994)). The superior court properly grants a motion for summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). Here, there are no disputed facts; the issue before us is whether the County's ordinance violates article XI, §11 of the Washington Constitution.

We presume that enacted ordinances are constitutional. *Weden*, 135 Wn.2d at 690 (quoting *Holmes Unlimited, Inc. v. City of Seattle*, 90 Wn.2d 154, 158, 579 P.2d 1331 (1978)).[3] Whether an ordinance is constitutional is a question of law that we review de novo. *Weden*, 135 Wn.2d at

---

[3] The County asserts that because ordinances are presumed constitutional, Ecology bears the burden of proving that the ordinance is unconstitutional beyond a reasonable doubt. According to the County this standard imposes a higher burden on Ecology. The County asserts that under this burden, "it is not enough even for [Ecology] to prove it is right. It must prove *it cannot possibly be wrong.*" Br. of Resp't at 9.

The County not only misstates the "beyond a reasonable doubt" standard, but it provides no citation any authority supporting its contentions that "beyond a reasonable doubt" means that the party bearing the burden must prove that it cannot be wrong. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). In this case, such an assumption is particularly appropriate because Washington courts do not define beyond a reasonable doubt by requiring the party bearing the burden to prove that it is not wrong. Therefore, although the County is correct that we presume the constitutionality of an ordinance, the County presents no valid reason for (1) departing from the standards of review articulated in cases addressing whether an ordinance conflicts with state laws, or (2) imposing the unrealistically high burden on the Department to prove that it cannot possibly be wrong in order to prevail on its claim.

4

693 (citing *City of Seattle v. Williams*, 128 Wn.2d 341, 346-47, 908 P.2d 359 (1995); *Washam v. Sonntag*, 74 Wn. App. 504, 507, 874 P.2d 188 (1994)).

## II. THE COUNTY'S ORDINANCE CONFLICTS WITH STATE LAW

Article XI, § 11 of the Washington Constitution states, "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." An ordinance is constitutional unless "(1) the Ordinance conflicts with some general law; (2) the Ordinance is not a reasonable exercise of the County's police power; or (3) the subject matter of the Ordinance is not local." *Weden*, 135 Wn.2d at 692.

Ecology argues that the County's ordinance violates article XI, § 11 because it conflicts with the general laws governing the disposal and land application of biosolids. We agree.

An ordinance conflicts with a state law if the state law "'preempts the field, leaving no room for concurrent jurisdiction,' or 'if a conflict exists such that the two cannot be harmonized.'" *Weden*, 135 Wn.2d at 693 (quoting *Brown v. City of Yakima*, 116 Wn.2d 556, 559, 561, 807 P.2d 353 (1991)). In *Weden v. San Juan County*, our Supreme Court stated:

> "'In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' *Village of Struthers v. Sokol*, 108 Ohio St. 263, 140 N.E. 519 [(1923)]. Judged by such a test, an ordinance is in conflict if it forbids that which the statute permits,'" *State v. Carran*, 133 Ohio St. 50, 11 N.E.2d 245, 246 [(1937)]."

135 Wn.2d at 693 (quoting *City of Bellingham v. Schampera*, 57 Wn.2d 106, 111, 356 P.2d 292, (1960)). An ordinance also irreconcilably conflicts with state law if it thwarts the legislature's purpose. *Diamond Parking, Inc. v. City of Seattle*, 78 Wn.2d 778, 781, 479 P.2d 47 (1971) ("We are of the opinion that the conflict here is irreconcilable. If the ordinance is given the effect for

which the appellant contends, the legislative purpose is necessarily thwarted."). Finally, an ordinance conflicts with state law if a county exercises power that the relevant state law did not confer to the counties. *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 699, 169 P.3d 14 (2007).

Reading the case law regarding conflict between a county ordinance and state law as a whole, the County's ordinance conflicts with the state law and is unconstitutional if it (1) prohibits what the state law permits, (2) thwarts the legislative purpose of the statutory scheme, or (3) exercises power that the statutory scheme did not confer on local governments. Here, Ecology has demonstrated that all three of these scenarios render the County's ordinance unconstitutional. Accordingly, the superior court erred by granting summary judgment in the County's favor.

A.     THE COUNTY'S ORDINANCE PROHIBITS WHAT STATE LAW PERMITS

As stated above, a county ordinance that prohibits what state law permits is in conflict with general laws and in violation of article XI, § 11. *Weden*, 135 Wn.2d at 693. Ecology argues that the County's ordinance prohibits what the state law permits because state law, and the corresponding Department regulations, create a comprehensive permitting scheme for the land application of class B biosolids. Ecology is correct.

In *Biggers*, the City of Bainbridge Island passed a moratorium on shoreline development. 162 Wn.2d at 688-90. Our Supreme Court held that the moratorium irreconcilably conflicted with the state's Shoreline Management Act (SMA)[4] because the SMA created a comprehensive regulatory scheme for permitting shoreline development. *Biggers*, 162 Wn.2d at 697-98.

---

[4] Ch. 90.58 RCW.

Similarly, in *Diamond Parking*, our Supreme Court held that the City of Seattle's ordinance prohibiting the transfer of licenses irreconcilably conflicted with state law allowing the rights and privileges of one corporation to transfer to another corporation upon merger. 78 Wn.2d at 786. The court reasoned that the state had created a comprehensive statutory scheme governing corporations and the City could not prohibit what state corporate law allowed. *Diamond Parking*, 78 Wn.2d at 781-82.

Here, the legislature directed Ecology to create a comprehensive regulatory scheme to manage biosolids, including land application of class B biosolids. *See* ch. 70.95J RCW. Under the regulatory scheme, Ecology may issue permits for land application of class B biosolids, provided the application for the permit meets certain standards. RCW 70.95J.025, .020. Thus, Ecology had the authority to regulate and permit the use and disposal of class B biosolids. And, Ecology's regulations have the force of state law. *See Gen. Tel. Co. of NW, Inc. v. City of Bothell*, 105 Wn.2d 579, 583, 716 P.2d 879 (1986). Because the County's ordinance conflicts with state law by banning what has been permitted, it impermissibly prohibits what state law explicitly permits.

The County's arguments to the contrary are unpersuasive. First, the County argues that it has not prohibited all land application of biosolids, but rather it has simply imposed further, more stringent regulations, pursuant to its own police power. However, although the County's regulation allows for land application of class A biosolids, the County does not address the fact that the ordinance prohibits any land application of class B biosolids even though the state scheme explicitly sets criteria for permitting land application of class B biosolids. Even if the County had authority to more strictly regulate land application of biosolids, it does not have the authority to

7

No. 44700-2-II

entirely prohibit the land application of class B biosolids when such application is allowed under a comprehensive regulatory scheme that has been enacted in accordance with legislative directive. *Gen. Tel.*, 105 Wn.2d at 586-87.

The County relies on *Weden* to argue that a county can prohibit an activity even if state law allows a person to obtain a permit for that activity. But the County's reliance on *Weden* is misplaced. In *Weden*, San Juan County passed an ordinance prohibiting the use of personal watercraft in San Juan County waters. 135 Wn.2d at 684. Users of personal watercraft argued that the ordinance was invalid because it conflicted with chapter 88.02 RCW governing registration of water vessels. *Weden*, 135 Wn.2d at 694-95. Our Supreme Court rejected this contention stating:

> The Legislature did not enact chapter 88.02 RCW to grant [personal watercraft] owners the right to operate their [personal watercraft] anywhere in the state. The statute was enacted to raise tax revenues and to create a title system for boats.

*Weden*, 135 Wn.2d at 694.

Here, the statutes and regulations managing biosolids are far more complex than simply generating revenue or creating a title system. The legislature specifically directed Ecology to adopt rules to implement a biosolids management program that "to the maximum extent possible" ensures that biosolids are "reused as a beneficial commodity." RCW 70.95J.005(2), .020. Under that directive, Ecology adopted a regulatory scheme that specifically grants permits for land application of class B biosolids and, thus, created a right to land application of class B biosolids when a permit is acquired. As the farm amici explain, the permitting process for land application of biosolids is in-depth and time consuming. In order to obtain a permit for land application of

8

biosolids the farm must submit a Site-Specific Land Application Plan that takes into account "site boundaries, proposed staging areas, location of all water bodies and wells, and buffer zones to protect sensitive areas." Br. of Farm Amici at 6. The Site-Specific Land Application Plan is also subject to public comments and public meetings. Permit applicants must work closely with Ecology when attempting to obtain a permit for land application of biosolids. Farmers have come to rely on the well-established and uniform state regulation of land application of biosolids for planning and investment.

As the current scope of the state's permitting scheme demonstrates, the permitting of land application of biosolids does significantly more than generate revenue or create a title system. *Weden* does not support the County's argument.

B.    THE COUNTY'S ORDINANCE THWARTS THE LEGISLATURE'S PURPOSE

Ecology also argues that the County's ordinance irreconcilably conflicts with state law because enactment of the County's ordinance thwarts the legislature's purpose in enacting state law. Specifically, Ecology argues that the legislature intends that sewage waste be recycled and used for land application rather than be disposed of in a landfill or incinerated. Because the County's ordinance bans land application of all class B biosolids, which is the overwhelming majority of biosolids produced in Washington, it effectively prohibits land application of biosolids, especially land application of biosolids in farming and land reclamation. Moreover, as Ecology points out, if local governments have the power to ban land application of biosolids, land application of biosolids could be banned throughout the state, clearly thwarting the legislature's purpose of recycling biosolids through land application rather than landfill disposal or incineration.

The County's ordinance thwarts the express purpose of the legislature and, thus, is irreconcilable with state law and unconstitutional under article XI, § 11.

Ecology states that the statutory scheme for the disposal of biosolids demonstrates a clear legislative preference for the land application of biosolids rather than incineration or disposal in a landfill. Ecology is correct. When enacting the statutory scheme for the disposal of biosolids, the legislature directed Ecology to ensure that biosolids are "reused as a beneficial commodity" to *the maximum extent possible*. RCW 70.95J.005(2). The legislature's stated intent was to increase the recycling and reuse of biosolids, and it tasked Ecology with carrying out that mission.

Based on the undisputed facts in the record, class B biosolids comprise approximately 88 percent of the biosolids produced in the state. Ecology argues that by banning class B biosolids, the County has essentially banned the land application of biosolids within the County. The County disputes this argument by stating that 12 percent of biosolids produced in the state (class A) can still be used within the County. However, as the record shows, class A biosolids have a specific purpose: home lawn and garden, and application where public restriction is not plausible. Because class A biosolids have a specific purpose, they are not meant to be used in the same manner as class B biosolids. Therefore, preventing the land application of an entire class of biosolids specifically intended for land application thwarts the legislature's stated purpose of reusing biosolids to the maximum extent possible.

Further, Ecology argues that upholding the County's ordinance thwarts the legislature's purpose by allowing any county in the state to prohibit land application of class B biosolids. The County responds that Ecology's argument must fail because Ecology cannot show that all counties would ban the land application. But, the County fails to recognize the salient point in Ecology's

argument—if all counties had the power to determine whether to ban land application of class B biosolids, then the entire statutory and regulatory scheme enacted to maximize the safe land application of biosolids would be rendered meaningless. *See City of Los Angeles v. County of Kern*, 214 Cal. App. 4th 394, 154 Cal. Rptr. 3d 122 (2013), *rev'd on other grounds*, 59 Cal. 4th 618, 328 P.3d 56 (2014).[5] The County's ordinance thwarts the legislature's purpose by usurping state law and replacing it with local law. Therefore, we hold that the County's ordinance is unconstitutional under article XI, § 11.

Ecology also has the authority to prohibit the disposal of biosolids in landfills unless other uses or disposal methods are economically infeasible. RCW 70.95.255. Ecology has exercised this authority to prohibit the disposal of biosolids in landfills through WAC 173-308-300. Under WAC 173-308-300(9) a permit must be acquired in order to dispose of biosolids in a landfill. A permit may not be acquired unless the applicant can demonstrate "to the satisfaction of the

---

[5] Specifically the court stated:

> Land application of biosolids is a widely used, widely accepted, comprehensively regulated method by which municipalities fulfill their obligation to reduce the flow of waste to landfills. . . . One jurisdiction's action to ban it, and to interfere with other jurisdictions' efforts to comply with their CIWMA obligations, is not consistent with a statutory scheme that presumes all jurisdictions will have access to crucial waste-stream-reduction methods. If we held that Kern County is empowered to ban land application of biosolids, we would necessarily be implying that all counties and cities are empowered to do the same. . . . Kern County asks us to adopt a position that would authorize all local governments to say "not here." That principle would not be consistent with a statute that requires all local governments to adhere to waste management plans in which recycling is maximized.

*City of Los Angeles*, 154 Cal. Rptr. 3d at 139. The court also rejected Kern County's characterization of the City's argument as a "slippery slope" argument and as based on speculation. *City of Los Angeles*, 154 Cal. Rptr. 3d at 139 n.12. The California Supreme Court later reversed the Court of Appeals based exclusively on a procedural issue regarding tolling of the statute of limitations while a claim is pending in federal court. *City of Los Angeles v. County of Kern*, 59 Cal. 4th 618, 328 P.3d 56 (2014).

department that options for beneficial use are economically infeasible." WAC 173-308-300(9)(a).[6] A ban on land application of biosolids causes a direct conflict with the mandate that biosolids be disposed of as a beneficial commodity rather than disposal in a landfill. Thus, the County's ban on land application of class B biosolids does not just thwart the legislature's purpose to use biosolids to the maximum extent possible, it also thwarts the legislature's purpose to prevent disposal of biosolids in landfills absent economic infeasibility.

C.    THE COUNTY HAS EXERCISED POWER NOT CONFERRED TO LOCAL GOVERNMENTS UNDER THE STATUTORY SCHEME

The County's ordinance also clearly exercises power the legislature did not confer on local governments under the statutory scheme for management or disposal of biosolids. The County argues that it has the authority to further regulate land application of biosolids under WAC 173-308-030(6), including banning land application of class B biosolids. Although we agree that the County may have the authority to further regulate land application of biosolids to comply with other laws, we do not agree that the County has the authority to completely ban the land application of class B biosolids when such a ban conflicts with state law.

WAC 173-308-030(6) requires facilities and sites where biosolids are applied to land to comply with other applicable federal, state and local laws, regulations and ordinances, such as zoning and land use requirements. This regulation recognizes that land application of biosolids does not exist in a vacuum, but rather, that there are other laws that may also apply to facilities and sites engaging in land application of biosolids. This is reflected in the other sections of WAC 173-

---

[6] Although incineration is another method of disposing of biosolids, the County has not presented any argument or authority suggesting that disposal of biosolids by incineration is considered an alternative beneficial use that would further the legislature's purpose.

308-030 which, for example, recognize that fertilizers also have to comply with Department of Agriculture requirements and transportation of biosolids also have to comply with regulations of the Washington State Utilities and Transportation Commission. Read in context, WAC 173-308-030(6) provides for additional local regulation required under other applicable laws.[7] Thus, the County may regulate biosolids if necessary to comply with other applicable laws. However, the County does not have the authority to completely ban the land application of all class B biosolids when that ban conflicts with state law.

The County further argues that the legislature intended for the counties to be the ultimate decision maker regarding the use of biosolids because RCW 70.95J.007[8] references the regulatory requirements under the federal Clean Water Act, which includes a savings clause that states, in relevant part, "The determination of the manner of disposal or use of sludge is a local determination." 33 U.S.C. § 1345(e). We disagree.

Even if we assume, without deciding, that this savings clause applies after a state has received delegation from the EPA to administer a State permitting program for sewage sludge disposal, a local determination still must comply with our state Constitution. When a local

---

[7] For example, the Growth Management Act (GMA) requires all counties to protect critical areas, surface water, and groundwater resources. RCW 36.70A.060(2), .070(5)(c)(iv). If necessary to protect critical areas, it is conceivable that the county could regulate the application of biosolids in relation to the mandates of the GMA. And, WAC 173-308-030(6) would require facilities and sites to comply with these regulations.

[8] RCW 70.95J.007 states:
> The purpose of this chapter is to provide the department of ecology and local governments with the authority and direction to meet federal regulatory requirements for municipal sewage sludge. The department of ecology may seek delegation and administer the sludge permit program required by the federal clean water act as it existed February 4, 1987.

ordinance prohibits what the state law explicitly permits or thwarts the state's legislative purpose, as the County's ordinance does here, it violates our State's constitution. As shown above, counties have the authority to adopt "all such local police, sanitary and other regulations as are not in conflict with general laws." WASH. CONST. art. XI, § 11. However, as previously discussed, the County lacked the authority under our state Constitution to adopt this ordinance. Thus, even if we assume that the savings clause of the federal Clean Water Act applies to these issues, the "local determination" referenced in the savings clause must be one that Wahkiakum County has the authority to make. As shown the County lacked authority to adopt the ordinance in question.

The County also argues that the legislature's decision to strike a provision related to a county's authority under the biosolids statute demonstrates its intent to have the counties be the ultimate authority on the management of biosolids. The County relies on a statement in a House Bill Report on H.B. 2640, 52d Leg., Reg. Sess. (Wash. 1992). In the section comparing the original bill to the substitute bill, the report states, "The substitute bill also deletes a provision restricting local government's ability to ban the use or disposal of sludge." H.B. REP ON H.B. 2640, at 3. But, read as a whole, the legislative history undermines the County's argument. The provision that was struck read:

> A city, county, or local health department may prohibit, on a permit-by-permit basis only, the use or disposal of municipal sewage sludge that meets standards established by this chapter.

H.B. 2640, § 5, 52d Leg., Reg. Sess. (Wash. 1992). However, the legislature also struck another provision that stated:

> The department shall adopt rules authorizing local permits for the use and disposal of sludge. The rules shall allow a city, county, or local health department

14

> to have primary regulatory authority. Department rules shall provide for state
> review of the issuance or denial of local permits and enforcement actions.

H.B. 2640, § 4(4). Therefore, although the language of the bill report appears to state that the legislature struck a provision that limited local authority, it is clear from a comparison of the original bill and the substitute bill that the changes to the bill reduced the authority of local governments to manage the biosolids program. This conclusion is consistent with the legislature's intent to create a comprehensive state program for the management of biosolids. Accordingly, the legislative history of the biosolids statute provides no support for the County's position that the legislature intended for local governments to retain the authority to ban the land application of biosolids.

Further, the statutory scheme gives the Department the authority to review and grant permit applications for the use and disposal of biosolids. RCW 70.95J.025, .020. Although the legislature has provided a mechanism for Ecology to delegate this responsibility to local health departments if it chooses to do so, Ecology retains the authority to revoke the delegation of authority if the local health department is not effectively administering the biosolids program. RCW 70.95J.080. Ecology also retains the power to review the decisions of the local health departments. RCW 70.95J.090. If the legislature did not grant the County the power to review, grant, or deny permits under the state biosolids program without an express delegation of authority by Ecology, then the legislature could not have intended to grant the County authority to unilaterally ban land application of an entire class of biosolids that comprise the majority of the biosolids produced in Washington. Further, by expressly giving Ecology the authority to reverse the decision of a local

health department, the legislature intended for the final decision regarding land application of biosolids to rest with Ecology, not the local government.

We hold that the County's ordinance is unconstitutional under all three theories of conflict preemption. Therefore, the superior court erred by granting summary judgment in favor of the County. We reverse the superior court's order granting summary judgment in favor of the County and remand to the superior court for entry of summary judgment in favor of Ecology.

_____
Lee, J.

We concur:

_____
Hunt, J.P.T.

_____
Bjorgen, A.C.J.