# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| AMERICAN HOTEL & LODGING ASSOCIATION, SEATTLE HOTEL ASSOCIATION, and WASHINGTON HOSPITALITY ASSOCIATION, <br><br> Appellants, <br><br> v. <br><br> CITY OF SEATTLE, UNITE HERE! LOCAL 8, and SEATTLE PROTECTS WOMEN, <br><br> Respondents. | No. 77918-4-I <br><br> DIVISION ONE <br><br> PUBLISHED OPINION <br><br><br><br><br> FILED: December 24, 2018 |



ANDRUS, J. — In November 2016, the citizens of Seattle voted to adopt Initiative 124 (I-124), now codified at Seattle Municipal Code ch.14.25. Three hotel associations challenge the initiative as a violation of the "single subject" rule of RCW 35A.12.130 and article IV, section 7 of the Seattle City Charter. We conclude the ordinance contains provisions not germane one to another and, therefore, violates the single subject rule. We reverse.

## FACTS

On November 8, 2016, Seattle voters approved I-124. The ballot title for this initiative read as follows:

> Initiative 124 concerns health, safety and labor standards for Seattle hotel employees.

> If passed, this initiative would require certain sized hotel-employers to further protect employees against assault, sexual harassment, and injury by retaining lists of accused guests among other measures; improve access to healthcare; limit workloads; and provide limited job security for employees upon hotel ownership transfer. Requirements except assault protections are waivable through collective bargaining. The City may investigate violations. Persons claiming injury are protected from retaliation and may sue hotel-employers. Penalties go to City enforcement, affected employees, and the complainant.
>
> Should this measure be enacted into law?
>
> Yes
> No

The initiative passed with 76.59 percent of the vote. The City certified the results on November 29, 2016, and the initiative went into effect the following day.[1]

The initiative has seven parts. Part 1 is intended to protect hotel employees from violent assault and sexual harassment by guests. SMC 14.25.020. If a hotel employee is assigned to work in a guest room without other employees present, the employer must provide that employee with a panic button to use in an emergency. SMC 14.25.030. Hotel employers must maintain a list of names of any guest accused of assaulting, sexually assaulting, or sexually harassing hotel employees. SMC 14.25.040(A). Any guest accused of such misconduct must remain on the list for five years, and hotel employers must notify other employees assigned to an accused guest's room and warn them to exercise caution when entering that room. SMC 14.25.040(A), (C). If an accusation is supported by a

---

[1] The ordinance authorized and directed the Office of Labor Standards to promulgate rules consistent with the new chapter. SMC 14.25.150(D)(2). The rules became effective in July 2018. SHRR 150-010 to -300.

sworn statement "or other evidence,"[2] the hotel employer must bar the guest from the hotel for three years. SMC 14.25.040(B). Part 1 also requires hotel employers to post signs notifying guests of the protections afforded by I-124. SMC 14.25.050. Lastly, Part 1 provides that after an employee accuses a guest of sexual assault or harassment, a hotel employer must reassign the employee to a different work area upon request, provide paid time off to allow the employee to contact the police, a counselor, or an advisor, and, with the employee's consent, report any accusations of criminal conduct by guests to law enforcement. SMC 14.25.060.

Part 2 seeks to protect hotel workers from on-the-job injury. SMC 14.25.070. SMC 14.25.080 requires hotel employers to provide and use safety devices and safeguards, as well as "use work practices, methods, processes, and means" that are "reasonably adequate to make their workplaces safe." Under rules adopted by the Seattle Office of Labor Standards in July 2018, the workplace safety requirements of SMC 14.25.080 "must at least meet those outlined by the Washington Industrial Safety and Health Act" (WISHA), RCW ch. 49.17 and its administrative regulations. SHRR 150-070.

SMC 14.25.090 requires hotel employers to protect their employees from exposure to hazardous chemicals by controlling chemical agents, protecting employees from having contact with or being exposed to chemical agents, and providing employees with information on hazardous chemicals in their work areas.[3]

---

[2] "Other evidence" is not defined in the ordinance. SHRR 150-050(3) defines "other evidence" as "evidence other than statements of the victim, witnesses, or other persons, that tends to support an accusation of assault, sexual assault, or sexual harassment against a guest," including "physical evidence, audio and video recordings or photographs of events, occurrences, injuries, incident scenes, or other similar evidence."

[3] SHRR 150-080 provides that employers "must use methods of controlling chemical agents that at least meet the minimum requirements" of WISHA and its administrative regulations. SHRR 150-

SMC 14.25.100 prohibits "large hotels," defined as hotels with 100 or more guest rooms,[4] from requiring housekeepers to clean more than 5,000 square feet of floor space in an eight-hour workday unless the hotel pays the worker time and a half. Under administrative regulation, an employee has a right to refuse the employer's request to clean more than the maximum square footage allowed in the ordinance. SHRR 150-140.

Part 3 is intended to improve access to medical care for hotel employees. SMC 14.25.110. Under SMC 14.25.120, "large hotel" employers must provide healthcare subsidies to low-wage employees or provide health care coverage equal to at least a gold-level policy on the Washington Health Care Benefit Exchange.

Part 4 provides job security to hotel workers by requiring hotels undergoing a change in ownership or control to maintain a list of employees, based on seniority. SMC 14.25.130. The new hotel owner must hire its employees from this list for six months and retain employees hired from this list for at least 90 days, unless there is good cause for termination. SMC 14.25.140.

Part 5 is entitled "Enforcement." SMC 14.25.150(A) makes it a violation for any hotel employer to interfere with any right protected by the ordinance or to discharge any employee exercising rights under the ordinance. If an employer takes an adverse action within 90 days of that employee's exercise of rights under the ordinance, there is a rebuttable presumption of retaliation. SMC

---

090 similarly incorporates by reference the WISHA requirements for protecting employees from the hazard of contact with or exposure to chemical agents.
[4] SMC 14.25.160.

14.25.150(A)(5). Part 5 also prohibits hotel employers from threatening to report an employee's suspected citizenship or immigration status. SMC 14.25.150(A)(4). SMC 14.25.150(B) mandates that hotel employers give written notification to each employee of their rights under the ordinance in each language spoken by 10 or more employees.

SMC 14.25.150(C) creates a "private enforcement action." It provides that "any person claiming injury" from a violation of any part of the ordinance is entitled to bring a lawsuit in King County Superior Court or in any other court of competent jurisdiction to enforce its provisions. SMC 14.25.150(C)(1). The claimant "shall be entitled to all remedies available at law or in equity" and may seek "lost compensation and other damages, reinstatement, declaratory or injunctive relief, prejudgment interest, exemplary damages equal to the amount of wages wrongfully withheld or not paid" and to collect penalties described elsewhere in the ordinance. SMC 14.25.150(C)(1). A prevailing claimant is also entitled to an award of attorney fees and expenses. SMC 14.25.150(C)(2).

SMC 14.25.150(D) empowers the City's Office of Civil Rights to investigate alleged violations of the ordinance. It also authorizes the Division Director of the Office of Labor Standards within the Office of Civil Rights to promulgate rules "that protect the identity and privacy rights of employees who have made complaints" under the ordinance. SMC 14.25.150(D)(2).

SMC 14.25.150(E) sets out penalties a court may impose for ordinance violations. For each workday during which the employer is in violation, a court may impose a penalty of between $100 and $1,000 per day. SMC 14.25.150(E)(1). If

civil penalties are imposed, they must be distributed per the following formula: 50 percent to the Office of Labor Standards, 25 percent to "aggrieved employees," and 25 percent to the "person bringing the case." SMC 14.25.150(E)(2).

Part 6 defines key terms used in the ordinance. It does not define sexual assault or sexual harassment.

Part 7, entitled "Miscellaneous," includes a severability provision, SMC 14.25.180, and a provision prohibiting the waiver by agreement of the rights set out in the ordinance, unless contained in a collective bargaining agreement, SMC 14.25.170. SMC 14.25.170(B) provides that the provisions protecting employees from assault and sexual harassment and mandating hotels maintain lists of accused guests are not waivable.

The American Hotel & Lodging Association, the Seattle Hotel Association, and the Washington Hospitality Association (the Associations) brought suit to challenge I-124. The City of Seattle, and two intervening organizations, UNITE HERE! Local 8 and Seattle Protects Women (the Intervenors), defended the validity of the initiative. On cross-motions for summary judgment, the superior court upheld the validity of I-124. The Associations appeal.

## ANALYSIS

The Associations argue the initiative violates the single subject rule of RCW 35A.12.130, article IV, section 7 of the Seattle City Charter, and article II,

section 19 of the Washington State Constitution.[5] The City and Intervenors argue the provisions of I-124 encompass only one subject—employee health, safety, and welfare—and the initiative is thus valid.

Article II, section 19 of the Washington State Constitution provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." This constitutional provision does not apply to I-124 because article II, section 19, by its express terms, applies only to state legislation. Carlson v. San Juan County, 183 Wn. App. 354, 376-77, 333 P.3d 511 (2014). But RCW 35A.12.130 also requires city ordinances to contain only a single subject, and the Seattle City Charter, article IV, section 7, similarly provides that every ordinance "shall contain but one subject."

Article XI, section 11 of the Washington Constitution provides that no city may enact any law that conflicts with state general law. An ordinance is inconsistent with article XI, section 11 if it (a) prohibits what state law permits; (b) thwarts the legislative purpose of a statutory scheme; or (c) exercises power that the statutory scheme does not confer on local governments. Emerald Enters., LLC v. Clark County, 2 Wn. App. 2d 794, 803-04, 413 P.3d 92, review denied, 190 Wn.2d 1030, 421 P.3d 445 (2018). If I-124 violates the single subject mandate of RCW 35A.12.130, it would violate article XI, section 11 because it would constitute an exercise of power that the statute does not permit. See Dep't of Ecology v.

---

[5] The Associations also challenge Part 1 as a violation of the privacy and due process rights of its members' guests, and Part 2 as preempted by WISHA. Because we resolve this appeal on the single subject rule challenge, we need not reach the other issues.

Wahkiakum County, 184 Wn. App. 372, 377, 337 P.3d 364 (2014) (ordinance that conflicts with state general law is unconstitutional under article XI, section 11).

Initiatives are presumed to be constitutional. Amalgamated Transit Union Local 587 v. State, 142 Wn.2d 183, 204-05, 11 P.3d 762 (2000) (Amalgamated Transit); see also Citizens for Responsible Wildlife Mgmt. v. State, 149 Wn.2d 622, 631, 71 P.3d 644 (2003) (Citizens) (confirming that initiatives receive the same level of scrutiny as legislatively enacted bills). The party challenging an ordinance has the burden of demonstrating its unconstitutionality. Emerald Enters., 2 Wn. App. 2d at 804.

Although article II, section 19 does not directly apply, case law interpreting the constitutional single subject rule is relevant because the Washington Supreme Court has relied on this case law when evaluating whether a city ordinance violates RCW 35A.12.130. Filo Foods, LLC v. City of SeaTac, 183 Wn.2d 770, 781-82, 357 P.3d 1040 (2015). We review de novo the trial court's grant of summary judgment under the statutory single subject rule. Id. at 781.

Washington case law recognizes the single subject rule has three general purposes. Robert D. Cooter & Michael D. Gilbert, A Theory of Direct Democracy and the Single Subject Rule, 110 Colum. L. Rev. 687, 705-06 (2010) (Cooter & Gilbert). The first purpose is to prevent "logrolling." Wash. Ass'n for Substance Abuse & Violence Prevention v. State, 174 Wn.2d 642, 655, 278 P.3d 632 (2012) (WASAVP); Amalgamated Transit, 142 Wn.2d at 207. Logrolling is combining multiple measures, none of which would pass on its own, into an omnibus proposition that receives majority support. Cooter & Gilbert, at 706.

A second goal is to prevent "riding," or pushing through unpopular legislation by attaching it to popular or necessary legislation. Wash. Ass'n of Neighborhood Stores v. State, 149 Wn.2d 359, 368, 70 P.3d 920 (2003), abrogated on other grounds by Filo Foods, 183 Wn.2d 770; see also Michael D. Gilbert, Does Law Matter? Theory and Evidence from Single-Subject Adjudication, 40 J. Legal Studies 333, 338 (2011). The single subject rule was written into the Washington Constitution to address the "riding" problem:

> [T]here had crept into our system of legislation a practice of engrafting upon measures of great public importance foreign matters for local or selfish purposes, and the members of the Legislature were often constrained to vote for such foreign provisions to avoid jeopardizing the main subject or to secure new strength for it, whereas if these provisions had been offered as independent measures they would not have received such support.

Lee v. State, 185 Wn.2d 608, 620, 374 P.3d 157 (2016) (quoting State ex rel. Wash. Toll Bridge Auth. v. Yelle, 54 Wn.2d 545, 550-51, 342 P.2d 588 (1959)).

The rule's third purpose is to simplify the process and improve political transparency. Lee at 620; State v. Broadaway, 133 Wn.2d 118, 124, 942 P.2d 363 (1997) (policy underlying single subject rule is to provide notice to public of what is contained in proposed legislation). "In theory, limiting initiatives and referenda to a single subject makes it easier for citizens to understand and scrutinize their contents." Cooter & Gilbert, at 709.

Only where there exists a rational relationship between the provisions of the initiative and with the initiative's subject "can we be certain voters were not required to vote for an unrelated subject of which the voters disapproved in order to pass a law pertaining to a subject of which the voters were committed." City of Burien v. Kiga, 144 Wn.2d 819, 826, 31 P.3d 659 (2001). When an initiative embodies two

unrelated subjects, "it is impossible for the court to assess whether either subject would have received majority support if voted on separately." Id. at 825. An initiative embodying two unrelated subjects is, thus, void in its entirety. Lee, 185 Wn.2d at 620.

To determine whether an initiative violates the single subject rule, we first look to the ballot title[6] to determine whether it is general or restrictive because the type of title determines the analysis we undertake. Amalgamated Transit, 142 Wn.2d at 207-10. If the ballot title is general in nature, we look to the body of the initiative to determine whether "rational unity" exists among the matters addressed in the initiative. Kiga, 144 Wn.2d at 826. The existence of rational unity is determined by whether the matters are "germane" to the general title and to one another. Id. While rational unity must exist among all matters included within the measure and with the general topic expressed in the title, an initiative can embrace several "incidental" subjects or subdivisions "so long as they are related." Id. If, however, the ballot title is restrictive, the provisions of the initiative must all fall "fairly within" the restrictive language. Yelle, 32 Wn.2d at 26.

The parties disagree whether I-124's ballot title is general or restrictive. If a ballot title suggests a general, overarching subject matter, it will be considered general. Filo Foods, 183 Wn.2d at 782. A ballot title is restrictive when "a particular part or branch of a subject is carved out and selected as the subject of the legislation." Id. at 783. The Supreme Court's analysis in Filo Foods is dispositive

---

[6] The ballot title includes the statement of the subject of the measure, the description of the measure, and the question of whether or not the measure should be enacted into law. WASAVP, 174 Wn.2d at 655.

on this question. In that case, the court considered the ballot title to SeaTac's Proposition 1 which read:

> Proposition No. 1 concerns labor standards for certain employers.
>
> This Ordinance requires certain hospitality and transportation employers to pay specified employees a $15.00 hourly minimum wage, adjusted annually for inflation, and pay sick and safe time of 1 hour per 40 hours worked. Tips shall be retained by workers who performed the services. Employers must offer additional hours to existing part-time employees before hiring from the outside. SeaTac must establish auditing procedures to monitor and ensure compliance. Other labor standards are established.
>
> Should this Ordinance be enacted into law?

Id. The court concluded this title was general because it "generally concerns labor standards for certain employers." Id. at 784.

The Associations argue that the ballot title in I-124 is distinguishable and more restrictive than Filo Foods because it carves out for regulation the narrow topic of protecting hotel employees from sexual assault and harassment by requiring hotels to keep a list of accused guests. We agree this part of I-124's ballot title is restrictive. The language about protecting employees "against assault, sexual harassment, and injury by retaining lists of accused guests" does carve out for regulation a specific risk hotel workers confront. But the balance of the title broadens its scope to cover more general working conditions—"improv[ing] access to healthcare; limit[ing] workloads; and provid[ing] limited job security." In Amalgamated Transit, the Supreme Court held that a ballot title containing some restrictive language may, nevertheless, be categorized as a general title when the overall tenor of the ballot title is general in nature. 142 Wn.2d at 216-17. We conclude, under Filo Foods, I-124's ballot title is general.

While Filo Foods governs our conclusion as to the nature of the ballot title, it does not lead us to conclude that I-124 passes the rational unity test. The City and Intervenors argue the provisions of I-124 all share the related purpose of ensuring employee health, safety, and welfare, and the initiative is analogous to Filo Foods. But Proposition 1, at issue in Filo Foods, is distinguishable from I-124 in several material ways. Filo Foods' Proposition 1 set out minimum employment standards for certain hospitality and transportation employers in the city of SeaTac. 183 Wn.2d at 778. The Supreme Court concluded that Proposition 1's hourly minimum wage, paid sick leave, tip retention, and 90-day worker retention provisions all had the related purpose of establishing "minimum employee benefits, including job security." Id. at 785.

Unlike Filo Foods, I-124, by its own language, identifies at least four distinct and separate purposes. Part 1 is intended to protect certain hotel employees from violent assault and sexual harassment. SMC 14.25.020. Part 2 is intended to protect hotel employees from on-the-job injuries arising out of heavy lifting, repetitive tasks, and chemical exposure. SMC 14.25.070. Part 3 is intended to improve hotel workers' access to affordable medical care. SMC 14.25.110. And Part 4 is intended to provide job security to low income hotel workers when there is a change in hotel ownership. SMC 14.25.130.

The City and Intervenors, relying on language from Amalgamated Transit, argue each of these parts "will, or may, facilitate" the stated purpose of improving the health, safety, and working conditions of employees at certain hotels. 142 Wn.2d at 209. Whether a provision may facilitate the initiative's purpose is but one

part of a two-part test. While the initiative's various parts may be germane to the general topic of employee health, safety, and working standards, rational unity requires that matters within the body of the initiative be germane not only to the general title, but also to one another. WASAVP, 174 Wn.2d at 656.

Each of I-124's provisions is arguably related to the ballot title because each "may facilitate" the "health, safety and labor conditions" of certain hotel workers. But the purposes of the operative provisions in Parts 1 through 4 are completely unrelated. Where Filo Foods had one single purpose, I-124 has four, each of which sets out very different and distinct public policies.

The initiative is, thus, more analogous to Amalgamated Transit, Kiga, and Lee, than to Filo Foods. In Amalgamated Transit, the ballot title for I-695 stated, "Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed?" 142 Wn.2d at 212. Although the Supreme Court held the ballot title was a general one, it found no rational unity between the subjects of I-695 because the provisions setting license tab fees at $30 and those providing a continuing method to approve all future tax increases had two unrelated purposes. Id.

In Kiga, the ballot title to I-722 stated, "Shall certain 1999 tax and fee increases be nullified, vehicles exempted from property taxes, and property tax increases (except new construction) limited to 2% annually?" 144 Wn.2d at 825. The Court held that while the tax nullification provision and the property tax assessment provisions were related to the general topic of tax relief, those subjects were not germane to each other. Id. at 827. It reasoned that "[t]he nullification

and onetime refund of various 1999 tax increases and monetary charges [was] unnecessary and entirely unrelated to permanent, systemic changes in property tax assessments." Id.

Finally, in Lee, the Supreme Court invalidated I-1366, an initiative that imposed a one-time reduction in sales taxes if the legislature failed to pass a constitutional amendment requiring a two-thirds vote of the legislature to enact any new taxes. 185 Wn.2d at 613. Specifically, it saw

> no substantive difference between the one-time tax reduction coupled with a permanent change to the way all taxes are levied or assessed in Amalgamated [Transit] and Kiga, which violated the single-subject rule, and the reduction of the current sales tax rate and a permanent change to the constitution or to the method for approving all future taxes and fees set forth by [the initiative].

Id. at 622-23. It held that even if the subjects were related to the general topic of fiscal restraint or taxes, they were not germane to each other. Id. at 623; see also Barde v. State, 90 Wn.2d 470, 472, 584 P.2d 390 (1978) (no rational unity between criminal sanctions for dognapping and attorney fees in a civil action, even if both were germane to the general topic of taking or withholding property); Wash. Toll Bridge Auth. v. State, 49 Wn.2d 520, 523-24, 304 P.2d 676 (1956) (finding no rational unity where general initiative title—toll roads—contained two unrelated purposes). Accordingly, the court held in Lee that the initiative violated the single subject rule and was void in its entirety. 185 Wn.2d at 629.

I-124 is analogous to Lee's I-1366 because requiring hotels to maintain a list of people who have been accused of sexually harassing hotel employees is unrelated to limiting the number of square feet a hotel worker can be required to

clean in an eight-hour period without being paid overtime, or requiring a hotel to create a seniority list from which a new owner must hire employees for a period of time after a change in ownership. Part 1 of the initiative does not have, as its purpose, the same purpose as Part 2, 3, or 4. The unrelated purposes of the provisions of I-124 undermines any claim of rational unity.

Even assuming Part 1's guest registry requirements and Part 2's hazardous chemicals restrictions are related to the same goal of reducing on-the-job injuries, it is difficult to see how the guest registry provision is germane to providing hotel workers with employment security for a set period of time after a hotel changes ownership. In Filo Foods, the Supreme Court found rational unity between a similar 90-day employee retention provision and the minimum wage provisions of Proposition 1 because both provisions related to maintaining job security. 183 Wn.2d at 785. But protecting some employees from a guest's sexual assault or harassment has a different purpose than ensuring that all hotel employees maintain their jobs when a hotel changes ownership.

Moreover, none of the first four parts of I-124 are necessary to implement any other part of the initiative. Although "[a]n analysis of whether the incidental subjects are germane to one another does not necessitate a conclusion that they are necessary to implement each other, . . . that may be one way to do so." Citizens, 149 Wn.2d at 638. In WASAVP, the Supreme Court affirmed an initiative privatizing liquor sales despite the inclusion of an earmark of funds for public safety because the earmark provision was "necessary to implement" the statute. 174 Wn.2d at 656; see also Lee, 185 Wn.2d at 623 (discussing WASAVP). No similar

connection, however, exists between the first four sections of I-124. Part 1's sexual harassment provisions are not necessary to implement Part 2's hazardous chemical restrictions, or vice versa. Similarly, Part 3's requirements for medical insurance subsidies are not necessary to implement Part 1's sexual harassment protections, or vice versa. And Parts 1, 2, and 3 are not necessary to implement Part 4's seniority list and job security provisions.

Part 5 is the only provision that could fit into a "necessary to implement" category. Part 5 sets up a unique enforcement system by creating a new cause of action for injured hotel employees to sue employers for damages and to recover attorney fees. SMC 14.25.150(C). Part 5 also authorizes the City's Office of Civil Rights to investigate alleged violations, SMC 14.25.150(D), and it purports to empower a superior court to impose civil penalties for violations, SMC 14.25.150(E). Part 5 also contains a provision prohibiting hotel employers from threatening to reveal the citizenship or immigration status of an employee or an employee's family member. SMC 14.25.150(A)(4)(b).

While Part 5 is arguably germane to the first four parts of the initiative, it does not make Parts 1 through 4 germane to each other. And Part 5 itself conflicts with key provisions of Washington's workers' compensation system by creating a private cause of action that does not now exist under Washington law. RCW 51.04.010 abolished all jurisdiction of the courts to hear worker injury cases. The Industrial Insurance Act represents a "grand compromise" between industry and labor to remove workplace injuries from the court system and to provide injured workers with a swift, no-fault compensation system for on-the-job injuries. Birklid

v. Boeing Co., 127 Wn.2d 853, 859, 904 P.2d 278 (1995). Even if the City can lawfully enact worker safety provisions that are stricter than those imposed by the Department of Labor & Industries, the City does not explain how an ordinance can confer subject matter jurisdiction on a state court to resolve work-related injury claims when, by statute, the legislature abolished that very jurisdiction over a century ago. See Laws of 1911, ch. 74, § 1 (enacting RCW 51.04.010). The private cause of action provision appears to be a classic example of logrolling prohibited by RCW 35A.12.130.

Intervenors argue that I-124 should be affirmed because there is a long history in Washington of legislatively addressing labor conditions in a single piece of legislation. In WASAVP, the Supreme Court relied on a well-established history of legislative appropriations of revenue under the Liquor Act[7] to demonstrate the relatedness of I-1183's liquor privatization provisions and the earmark for law enforcement funding. 174 Wn.2d at 657. Intervenors cite the Industrial Welfare Act (IWA) as proof of a similar history of legislating employee protections at the same time. This argument, however, does not pass scrutiny.

The IWA, originally passed in 1913, mandated the payment of minimum wages for women and made it unlawful to employ women or minors in any job that was "detrimental to their health or morals." Laws of 1913, ch. 174, §§ 1-2. The IWA is now codified in RCW ch. 49.12. But the IWA expressly excludes "conditions of labor otherwise governed by statutes and rules and regulations relating to industrial safety and health" administered by the Department of Labor & Industries.

---

[7] Title 66 RCW.

RCW 49.12.005(5). Industrial safety and health has historically been addressed in separate legislation—the Industrial Insurance Act, Title 51 RCW—not in the IWA. Indeed, employees assaulted on the job may not generally sue their employers for injuries and are limited to filing a claim under the Industrial Insurance Act. Brame v. W. State Hosp., 136 Wn. App. 740, 749, 150 P.3d 637 (2007). Contrary to the Intervenors argument, the legislature has not combined minimum wage and worker safety requirements in the same legislation for decades.

Additionally, the legislature has enacted laws to protect employees from sexual harassment on the job under the Washington Law Against Discrimination, RCW 49.60.180. But it has passed separate legislation to entitle an employee to overtime—the Washington Minimum Wage Act, RCW ch. 49.46. There is no history of legislatively combining sexual harassment protections with minimum wage requirements.

Unlike WASAVP, we find no history of the legislature treating sexual harassment protections, overtime provisions, protections from hazardous chemicals, and seniority list requirements together in the same legislation. In Lee, the Supreme Court distinguished WASAVP because it found "no history that the legislature ha[d] treated sales tax reductions and constitutional amendments or supermajority requirements together." Lee, 185 Wn.2d at 623. WASAVP is similarly distinguishable here. There is no legislatively recognized connection between protecting employees from sexual harassment and providing safeguards against unemployment or ensuring fair wages for fair work. Nor is there any such history of joining legislation to protect the confidentiality of an employee's and his

or her family members' immigration status with other health, safety, and labor standards.

Additionally, Part 1 regulates more than just the employee-employer relationship; it regulates the hotels' relationship with their guests by requiring hotels to ban certain guests for at least three years. There is no history of regulating an employer's relationships with its customers alongside labor standards for its employees. I-124's requirement in Part 1 to deny accommodation to guests accused of sexual harassment, and Part 2's wage requirements for housekeepers cleaning more than 5,000 square feet in a day, and Part 4's mandated seniority hiring list do not share the same rational relationship as the public safety earmark did to liquor regulation in WASAVP.

Nor does the Supreme Court's holding in Citizens save I-124. In that case, a consortium of wildlife management, outdoor recreation, and farming groups challenged the constitutionality of I-713, a law making it a gross misdemeanor to capture or kill an animal with steel leg traps or certain poisons. 149 Wn.2d at 627. The consortium argued that the provisions banning leg traps were not rationally related to the provisions banning the use of pesticides to kill wild animals. Id. at 637. The court held these two provisions were germane to each other because they both addressed particular methods of trapping and killing animals. Id. at 639.

The trial court in this case adopted a broad reading of Citizens in rejecting the Associations' single subject challenge to I-124. It concluded that the initiative expressed a single purpose and the provisions facilitated the accomplishment of this purpose and, for this reason, did not violate the single subject rule. I-124,

however, is distinguishable from the initiative in Citizens because Parts 1, 2, and 4 are not just different methods of protecting employees from on-the-job injuries. Nor are these three parts just different methods of ensuring job security. The initiative mixes, on the one hand, protections from sexual assault and exposure to hazardous chemicals with, on the other hand, limits on how much a worker can clean without being entitled to overtime pay and the creation of a seniority list for hiring purposes if a hotel is sold. Part 1's requirement that hotels maintain a list of guests accused of sexual harassment has no rational relation to Part 2's overtime pay requirements for hotel housekeepers or to Part 4's requirement that new hotel owners must hire from a current list of employees for six months and then retain them for 90 days. Although these subjects are all germane to the general title—health, safety, and labor standards—they are not germane to each other.

The key inquiry for the single subject rule is whether the subjects are so unrelated that "it is impossible for the court to assess whether either subject would have received majority support if voted on separately." Kiga, 144 Wn.2d at 825. In this case, it is impossible to determine whether any subject of I-124 standing alone would have received majority support if voted on separately. I-124 is similar to the initiative discussed in Kiga where our Supreme Court found logrolling of unrelated measures because

> a person who desired systemic changes to future property tax assessments but did not want to fiscally burden cities with the refunding of 1999 tax increases was required to vote for both measures or neither. Similarly, a person who did not own a home or who was otherwise unconcerned with changing methods for assessing property taxes but did desire a refund of other fees was required to vote for both measures or neither.

- 20 -

Id. at 828. Did I-124 receive overwhelming support because almost 80 percent of Seattle voters supported all the provisions? Or did a majority of the voters want to provide better healthcare to these workers and were willing to accept the guest registry provisions as a necessary evil to achieve the healthcare goal? The question could be asked for any combination of the subjects covered in I-124.

Because there is no rational unity between the provisions of I-124, it is impossible for the court to determine whether any provision would have received majority support if voted on separately. We conclude the Associations have carried their burden of proving that I-124 violates the single subject rule set out in RCW 35A.12.130 and article IV, section 7 of the Seattle City Charter. It is, thus, unconstitutional under Article XI, section 11 of the Washington Constitution and invalid in its entirety.

We reverse the trial court order granting summary judgment in favor of the City and Intervenors and remand to the superior court for entry of summary judgment in favor of the Associations.

Reversed.

WE CONCUR:

_Andrus, J._

_Dwyer, J._

_Schindler, J._